# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **CAROLYN L. LAVENDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:10CV903** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Carolyn L. Lavender, brought this action pursuant to Sections 202(e), 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 402(e), 405(g) and 1383(c)(3)), to obtain review of a final decision of the Commissioner of Social Security denying her claims for Disabled Widow's Benefits ("DWB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Act.[1] The Court has before it the certified administrative record and cross-motions for judgment.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DWB on January 25, 2007 and an application for SSI on January 27, 2007, both alleging an onset date of January 1, 2000, which was later amended

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Act, 42 U.S.C. § 405(g).

to August 1, 2006. (Tr. 12, 30, 45-47, 103-108.)[2] The application was denied initially and again upon reconsideration. (*Id.* at 54-62, 70-74.) Plaintiff then requested and was provided a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 77.) At the June 9, 2009 hearing were Plaintiff, her attorney, and a vocational expert ("VE"). (*Id.* at 26.) The ALJ determined that Plaintiff was not disabled under the Act. (*Id.* at 12-21.) On September 22, 2010 the Appeals Council denied Plaintiff's request for review, making the ALJ's determination the Commissioner's final decision for purposes of review. (*Id.* at 1-3.)

## II. FACTUAL BACKGROUND

Plaintiff was 43 years old on the alleged disability onset date—though she subsequently changed age category to closely approaching advanced age—had a marginal education, was able to communicate in English, and had no past relevant work. (*Id.* at 19.)

## III. STANDARD FOR REVIEW

The Commissioner held that Plaintiff was not under a disability within the meaning of the Act. Under 42 U.S.C. § 405(g), the scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). This Court's review of that decision is limited to determining whether there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hunter*, 993 F.2d at 34 (citing *Richardson v. Perales*, 402 U.S. 389, 401

---

[2] Transcript citations refer to the administrative record.

(1971)). It "consists of more than a mere scintilla" "but may be somewhat less than a preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

The Commissioner must make findings of fact and resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456 (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)). The Court does not conduct a de novo review of the evidence nor of the Commissioner's findings. *Schweiker*, 795 F.2d at 345. In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, to make credibility determinations, or to substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Hays*, 907 F.2d at 1456). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The denial of benefits will be reversed only if no reasonable mind could accept the record as adequate to support the determination. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). The issue before the Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See id.*; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. THE ALJ'S DISCUSSION

The Social Security Regulations define "disability" for the purpose of obtaining disability benefits as the "inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment[3] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. §§ 423(d)(1)(a), 1382c(a)(3)(A).[4] To meet this definition, a claimant must have a severe impairment which makes it impossible to do previous work or any other substantial gainful activity[5] that exists in the national economy. 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

## A. The Five-Step Sequential Analysis

The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled, which is set forth in 20 C.F.R. §§ 404.1520, 416.920. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). The ALJ must determine in sequence:

(1)     Whether the claimant is engaged in substantial gainful activity (*i.e.*, whether the claimant is working). If so, the claimant is not disabled and the inquiry ends.

(2)     Whether the claimant has a severe impairment. If not, then the claimant is not disabled and the inquiry ends.

(3)     Whether the impairment meets or equals to medical criteria of 20 C.F.R., Part 404, Subpart P, Appendix 1, which sets forth a list of impairments that warrant a

---

[3] A "physical or mental impairment" is an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423 (d)(3), 1382c(a)(3)(D).

[4] The definition of disability for disabled widow's benefits is the same as for the standard disability case and the five-step sequential evaluation process is applicable to disabled widow's benefits cases. *See* 20 C.F.R. §§ 404.1505(a), 404.1520(a)(2).

[5] "Substantial gainful activity" is work that (1) involves performing significant or productive physical or mental duties, and (2) is done (or intended) for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

finding of disability without considering vocational criteria. If so, the claimant *is* disabled and the inquiry is halted.

(4)     Whether the impairment prevents the claimant from performing past relevant work. If not, the claimant is not disabled and the inquiry is halted.

(5)     Whether the claimant is able to perform any other work considering both her residual functional capacity[6] and her vocational abilities. If so, the claimant is not disabled.

20 C.F.R. §§ 404.1520, 416.920.

Here, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her amended alleged onset date of August 1, 2006. (Tr. 14.)[7] The ALJ next found in step two that Plaintiff had the following severe impairments: diabetes mellitus and arthritis. (*Id.*)[8] At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1. (*Id.* at 16.) At the fourth step of the sequence the ALJ determined that Plaintiff had no past relevant work. (*Id.* at 19.) The ALJ reached the fifth step of the sequence and concluded that there

---

[6] "Residual functional capacity" is the most a claimant can do in a work setting despite the physical and mental limitations of her impairment and any related symptom (*e.g.*, pain). *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also Hines v Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory or skin impairments)." *Hall v. Harris*, 658 F.2d 260, 265 (4th Cir. 1981).

[7] The ALJ also noted that "It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits . . . ." (Tr. 14.)

[8] At the second step of the evaluation process, the ALJ concluded that Plaintiff had no limitation in her activities of daily living, mild limitations in social functioning, and mild limitations in concentration, persistence, or pace. (Tr. 16.)

were jobs in the national economy which Plaintiff could perform consistent with her RFC, age, education, and work experience. (*Id.*)

## B. Residual Functional Capacity Determination

Prior to step four, the ALJ determined Plaintiff's RFC based on his evaluation of the evidence, including Plaintiff's testimony and the findings of treating and examining health care providers. (*Id.* at 17-19.) Based on the evidence as a whole, the ALJ determined that Plaintiff retained the RFC to perform light work. (*Id.*) However, Plaintiff was limited to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (*Id.*) The ALJ noted too "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.*)

## C. Past Relevant Work

The ALJ found in step four that Plaintiff had no past relevant work. (*Id.* at 19.)

## D. Adjustment to Other Work

The claimant bears the initial burden of proving the existence of a disability. 42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(H)(i); 20 C.F.R. §§ 404.1512, 416.202-03; *Smith v. Califano*, 592 F.2d 1235, 1236 (4th Cir. 1979). If the claimant has established at step four that she cannot do any work she has done in the past because of her severe impairments, the burden shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy which the claimant could perform consistent with her RFC, age, education, and past

work experience. *Hunter*, 993 F.2d at 35; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980). The ALJ found that given her age, education, work experience, and RFC, there were jobs in the national economy that Plaintiff could perform, such as marker/labeler and sorter, which the VE characterized as light and unskilled work. (Tr. 20.)

## V.  ANALYSIS

The only issue Plaintiff raises is whether the ALJ properly concluded that she failed to meet or equal the requirements for an intellectual disability set forth in 12.5C of the Listings. (Docket Entry 12 at 5.) That listing is described, and its applicable criteria are set forth, as follows:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . .

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Where, as here, the paragraph C severity criteria are at issue, the Fourth Circuit has described the first showing—deficits in adaptive functioning initially manifested during the developmental period—as "Prong 1." *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012).

7

The Prong 1 diagnostic criteria for an intellectual disability includes two components—deficits in adaptive functioning *and* an onset before age 22—that must both be satisfied in order for the Listing to apply. *Id.* at 475 (commenting that an ALJ's finding that neither component was satisfied would be upheld if "[e]ither finding alone" was supported by substantial evidence). The Fourth Circuit has also described the conjunctive paragraph C requirements—a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function—as "Prong 2" and "Prong 3." *Id.* at 473.

Here, in his decision, the ALJ evaluated Plaintiff's claim that she met this listing and concluded as follows:

> At the hearing, the claimant's attorney argued that the claimant meets Listing 12.05C for mental retardation based on school records from an undetermined date in the 1960s indicating that her Full Scale IQ was 66. However, there is no indication that this is a valid IQ test. The IQ scores in Listing 12.05 reflect the Wechsler series,[9] which are tests of a general intelligence that have a mean of 100 and a standard deviation of 15. The school record in question does not specify what type of IQ test was administered. Given the test was administered more than 40 years ago, there is a great possibility that this was not a Wechsler test. Furthermore, there was no narrative accompanying the test result indicating whether the IQ score is valid or consistent with the claimant's developmental history and the claimant's degree of functional limitation of the claimant (Exhibits 1f, 2f). In addition, the claimant has failed to establish the deficits of adaptive functioning before the age 22. Despite quitting school after the seventh grade, the claimant testified that she is able to read and write, albeit with spelling errors. She even lists reading as one of her hobbies. She raised her own children,

---

[9] The Wechsler Adult Intelligence Scale provides verbal, performance, and full scale IQ scores, and the SSA uses the lowest of the three scores when analyzing Listing 12.05. 20 C.F.R. Part 404, Subpart P, App.1, § 12.00D(6)(c); *see also Rainey v. Heckler*, 770 F.2d 408, 410 (4th Cir. 1985).

helps with her grandchildren, and still performs housework. She did not allege low intellectual functioning at the initial or reconsideration stages. She has also failed to cooperate in consultative examinations, and consequently there is no recent I.Q. score on file. In sum, I find questionable the claimant's evidence suggesting she exhibited deficits of adaptive functioning before age 22. Therefore, I find that the claimant does not meet or equal Listing 12.05C.

(Tr. 16-17.) For the following reasons, the undersigned concludes that substantial evidence supports the ALJ's conclusion that Plaintiff has not met all the criteria in Listing 12.05C.

## A. Any Error in the ALJ's Prong 1 Analysis Is Harmless.

Plaintiff contends that she "clearly meets the first prong" of Listing 12.05C—deficits in adaptive functioning initially manifested during the developmental period—because:

> [A]t the hearing, Plaintiff testified that she only completed the seventh grade (Tr. 31); that she has never had a driver's license (Tr. 33); and that her daughter has to complete paperwork for her because she doesn't understand it (Tr. 40). In forms completed in connection with her claim, it was noted that Plaintiff has never had a savings account, has difficulty counting change, can't use a check book, is not good with math, and can write out money orders only with help (Tr. 165). In addition, Plaintiff has never performed substantial gainful employment (Tr. 41).
>
> Plaintiff's academic records show that she completed the seventh grade after having spent two years in the first grade, two years in the second grade, and two years in the sixth grade. Plaintiff was placed in the next grade several times, rather than promoted. When Plaintiff was in the fourth grade, testing revealed a Total I.Q. of 66 (Tr. 174-183). This is the only IQ testing of record and, as such, is not contradicted.

(Docket Entry 12 at 6.) For the reasons set forth below, the undersigned concludes that even if there is an error in the ALJ's Prong 1 analysis, that error is ultimately harmless.

While Prong 1 of Listing 12.05C "does not expressly define 'deficits in adaptive

functioning' . . . '[a]daptive activities' are described elsewhere in the [Mental Disorders] Listing . . . as 'cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.'" *Hawley v. Astrue*, No. 1:09CV246, 2012 WL 1268475, at *5 (M.D.N.C. Apr. 16, 2012) (citing *Blancas v. Astrue*, 690 F. Supp. 2d 464, 476 (W.D. Tex. 2010) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05 and 12.00(C)(1)); *accord Hager v. Astrue*, No. 2:09CV1357, 2011 WL 1299509, at *2 (S.D.W.Va. Mar. 31, 2011) (unpublished).[10]

Beyond this, in *Hancock v. Astrue*, the Fourth Circuit Court of Appeals provided a valuable standard of comparison for assessing an ALJ's findings regarding Prong 1's adaptive functioning requirement. In *Hancock*, the Fourth Circuit addressed for the first time whether an ALJ may reject an IQ score that is the only score in the record. 667 F.3d at 474. The claimant had been assigned a full scale IQ of 63 by the consultative examiner. *Id.* at 473. In his report, the examining psychologist did not attest to the validity of the scores or opine that the claimant gave her best effort. *Id.* The court reasoned that "[i]t is not at all clear whether an examiner's failure to attest to the validity of IQ scores *alone* would be sufficient to support an ALJ's decision to discredit the only IQ scores in the record." *Id.* at 475. Nevertheless, the court concluded that there was sufficient support for the ALJ to reject the sole IQ score on the record because it was inconsistent with the evidence in the record of the claimant's actual

---

[10] Though Listing 12.05 does not specifically define "adaptive functioning," SSA regulations provide that "[t]he definition of [mental retardation] . . . in [the] listings is consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018–01, at 20,022 (Apr. 24, 2002). Because "the SSA declined to adopt any one of [these] specific definitions . . . the introductory paragraph of Listing 12.05 can be met if the individual is found to have, inter alia, deficits in adaptive functioning as defined by any of the four professional organizations." *Durden v. Astrue*, 586 F. Supp. 2d 828, 834 (S.D. Tex. 2008).

functioning and the conclusions of treating psychiatrists. *Id.* at 475.

*Hancock* is also particularly relevant to a Prong 1 analysis because the Fourth Circuit upheld the ALJ's finding that the claimant failed to carry the burden of showing deficits in adaptive functioning where the claimant had: (1) "the ability to shop, pay bills, and make change," (2) "takes care of three small grandchildren at a level of care that satisfies the Department of Social Services," (3) "does the majority of her household's chores, including cooking and baking," (4) "is attending school to obtain a GED," and (5) "does puzzles for entertainment." *Id.* at 476.[11] Additional case law shows that the issue of whether a claimant manifested deficits in adaptive functioning during the developmental period is a fact-specific inquiry with few bright-line rules. *See, e.g., Salmons v. Astrue*, No. 5:10CV195–RLV, 2012 WL 1884485, at *5 (W.D.N.C. May 23, 2012) (collecting cases).

Additional case law suggests that literacy is also an important factor. *See Luckey v. U.S. Dep't of Heath & Human Servs.*, 890 F.2d 666, 668-69 (4th Cir. 1989); *Salmons*, 2012 WL 1884485, at *7; *Holtsclaw v. Astrue*, No. 1:10CV199, 2011 WL 6935499, at *4 (W.D.N.C. Dec. 30, 2011); *Rivers v. Astrue*, No. 8:10-cv-314-RMG, 2011 WL 2581447, *4 (D.S.C. June 28, 2011). Similarly, whether the claimant has ever lived independently is a relevant inquiry. *Compare Salmons*, 2012 WL 1884485, at *7 *with Holtsclaw*, 2011 WL 6935499, at *5.

Another guiding factor is whether the claimant has ever provided care for others, or whether she herself is dependent on others for care. *Compare Salmons*, 2012 WL 1884485, at

---

[11] Although the Fourth Circuit found these characteristics sufficient to support a finding of an absence of deficits in adaptive functioning, the Fourth Circuit did not intimate that those (or comparable) capabilities constituted the minimum necessary to uphold such a determination. *See Hancock*, 667 F.3d at 476 & n. 3.

*7 (noting claimant was heavily dependent on his mother and was not responsible for the care or supervision of others) and *Holtsclaw*, 2011 WL 6935499, at *4-5 (noting claimant had never lived independently and required a parent's help) *with Hancock*, 667 F.3d at 475-76 (affirming denial of benefits where the claimant managed the household and cared for her three young grandchildren) and *Caldwell v. Astrue*, No. 1:09cv233, 2011 WL 4945959, at *3 (W.D.N.C. Oct. 18, 2011) (claimant assisted in the care of elderly parent). School records and past academic performance are also important indicators of deficits in adaptive functioning prior to age 22. *See Salmons*, 2012 WL 1884485, at *7 ("[F]unctional academic skills is the primary measure of deficits of adaptive functioning before age 22."); *Rivers*, 2011 WL 2581447, at *3 (noting claimant classified as special needs at school, had repeated evaluations in elementary school with IQ scores all in the 50s, and dropped out of school in the ninth grade); *see also Conyers v. Astrue*, No. 4:11-CV-00037-D, 2012 WL 3282329, at *8 (June 29, 2012), *adopted in* 2012 WL 3283285 (E.D.N.C. Aug. 10, 2012) (discussing the claimant's school history).[12]

Additionally, work history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, *Luckey*, 890 F.2d at 669, can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. *Hancock*, 667 F.3d at 475–76 (concluding ALJ's finding that the claimant did not manifest requisite deficit in adaptive functioning to be supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs); *Harts v. Astrue*, 2012 WL 529982, at *6 n. 3 (D.S.C. Jan. 30, 2012) (distinguishing *Luckey* because the ALJ used the

---

[12] Although *Conyers* was addressing Listing 12.05B, the adaptive functioning analysis in that case is instructive even when the issue is whether the Listing 12.05C criteria are met.

claimant's work history as only one factor to support his finding of no significant deficits in adaptive functioning and because the claimant in *Harts* did not otherwise meet the Listing 12.05C criterion of a valid IQ score within the range of 60-70), *adopted and incorporated in* 2012 WL 529980 (D.S.C. Feb.17, 2012). Finally, the tasks a claimant is able to undertake, although not determinative, have been considered in this analysis. *See generally Radford v. Astrue*, No. 5:08-CV-421-FL, 2009 WL 1675958, at *6 (E.D.N.C. June 10, 2009) (finding that the claimant's ability to perform certain tasks was not inconsistent with mild mental retardation); *see, e.g., Hancock*, 667 F.3d at 476 & n. 3 (affirming ALJ's consideration of the claimant's ability to perform tasks such as shopping, paying bills, and making change); *Salmons*, 2012 WL 1884485, at *7 (discussing claimant's inability to do household chores, cook, and drive).

At her hearing in this case, Petitioner testified that she quit school in the eighth grade for unspecified reasons (Tr. 31), has no trouble writing other than spelling errors (*id.*), currently lives with family, can usually do dishes, make her bed, and do some cooking (*id.* at 31-33), has never had a driver's license, and had to have her daughter complete her benefits application for her because she did not understand it (*id.* at 40). Additionally, in forms completed in connection with her claim Plaintiff self-reported that she has a cat that she and her daughter care for (*id.* at 159), that she needs reminders to take her medication and to turn off the stove (*id.* at 160), that she can prepare sandwiches and one course meals, which she does twice weekly (*id.*), that she can perform light vacuuming and also can wash dishes (*id.* at 160), that she shops for food and clothes twice a month, and that she is not able to handle a savings account and that she cannot handle money because she "forget[s] how to count it," (*id.* at 161-62).

Plaintiff further self-reported that she enjoys reading and drawing as a hobby, that she cannot remember what she read, although she used to be able to, that she talks frequently with her daughter and sister (*id.* at 162), that "at one time" she was able to go "everywhere[, such as] stores [and] church," that she "never had [a] savings account [and was] scared to get one," that when she counts change she has "to[o] much or less than [she] started out with," that she cannot use a check book because she is "scared" and "not good at math," that she "[c]an write out money orders with help," that her memory is "very bad," (*id.* at 163-65), and that she was not in special education classes (*id.* at 119).

The record also contains eight pages of Plaintiff's school records. (*Id.* at 175-78, 180-83.) These academic records show Plaintiff completed the seventh grade after having spent two years in the first grade, two years in the second grade, and two years in the sixth grade. (*Id.* at 175.) She was "placed" in the next grade several times rather than "promoted." (*Id.*) These records also reveal that her attendance was often sporadic. For example, the year she repeated the sixth grade she was absent 67 times, another year she was absent 32 times, and only one of ten school years indicated a total number of absences in the single digits. (*Id.* at 175, 180.) A section of the Health Record also has a portion pre-printed "Reasons for Retardation" with eleven specific pre-printed reasons. Plaintiff's records have no entries in any of the elven pre-printed entries. An "other reason" has been entered and it states "undernourished." (*Id.* at 176-81.)

As indicated earlier, the ALJ concluded that Plaintiff failed to establish that she met Prong 1 of the analysis, concluding that:

> Despite quitting school after the seventh grade, the

claimant testified that she is able to read and write, albeit with spelling errors. She even lists reading as one of her hobbies. She raised her own children, helps with her grandchildren, and still performs housework. She did not allege low intellectual functioning at the initial or reconsideration stages. She has also failed to cooperate in consultative examinations, and consequently there is no recent IQ score on file. In sum, I find questionable the claimant's evidence suggesting she exhibited deficits of adaptive functioning before age 22.

(Tr. 17.)

Plaintiff's Prong 1 argument, the gravamen of which is that the ALJ failed to explicitly consider all evidence of her adaptive functioning, is not frivolous. Although—as indicated above—the ALJ does make some findings regarding Plaintiff's adaptive functioning, the ALJ does not explicitly address Plaintiff's school records, which indicate that she spent two years in the first grade, two years in the second grade, and two years in the sixth grade and was "placed" in the next grade several times rather than "promoted." On the other hand, her attendance was often sporadic and she is described as "malnourished" in her school records. And, while it is true that Plaintiff self-reported that she could read, albeit with spelling errors, and that reading was one of her hobbies, Plaintiff also self-reported that her daughter had to fill out her application for disability benefits for her. Moreover, the ALJ did not address Plaintiff's contention that she had never had a check book, could not handle a savings account, and that she cannot handle money because she forgets how to count it. Nor did the ALJ specifically address Plaintiff's contention that she never had a driver's license. As noted, these factors can be relevant in ascertaining the existence of deficiencies in adaptive functioning.

Nevertheless, the Court need not definitively resolve this issue. This is because even

assuming the ALJ's Prong 1 analysis is ultimately flawed, the ALJ's Prong 2 analysis is supported by substantial evidence. Listing 12.05C can only be satisfied if all three prongs are met. *Hancock*, 667 F.3d at 475 (concluding that Plaintiff "can prevail only if she establishes that the ALJ erred in his analysis of Prong 1 and Prong 2"). Thus, any Prong 1 error here—assuming such an error exists—is ultimately harmless in light of the following Prong 2 analysis set forth below.

### B. The ALJ's Prong 2 Analysis Is Supported by Substantial Evidence.

As noted, the undersigned concludes that the ALJ's Prong 2 analysis is supported by substantial evidence. As to this prong—"[a] valid verbal, performance, or full scale IQ of 60 through 70"—"[a]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." *Hancock*, 667 F.3d at 474. Subparagraph 6 (relating to intelligence tests) of paragraph D (addressing acceptable documentation) of § 12.00 (covering mental disorders generally) states:

> a. The results of standardized intelligence tests may provide data that help verify the presence of intellectual disability or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.
>
> b. Standardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A. . . .
>
> c. Due to such factors as differing means and standard deviations, identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual

16

> functioning. The IQ scores in 12.05 reflect values from
> tests of general intelligence that have a mean of 100 and a
> standard deviation of 15; e.g., the Wechsler series. IQs
> obtained from standardized tests that deviate from a mean of
> 100 and a standard deviation of 15 require conversion to a
> percentile rank so that we can determine the actual degree of
> limitation reflected by the IQ scores. In cases where more
> than one IQ is customarily derived from the test
> administered, e.g., where verbal, performance, and full scale
> IQs are provided in the Wechsler series, we use the lowest of
> these in conjunction with 12.05.

20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.00D.6.a, 12.00D.6.b, 12.00D.6.c.

Thus, to have a valid IQ score, a standardized intelligence test must be used and the results from the standardized test should be accompanied by a narrative report which assesses the validity of the test and comments upon whether it is consistent with the developmental history and the degree of functional limitation. *Id.* A standardized intelligence test is one that is generally accepted in the medical community as a scientifically valid test in terms of reliability and accuracy, such as the Wechsler series. *Id.* IQ tests that deviate from the metrics adopted by that series should be converted accordingly. *Id.*

The undersigned agrees with the ALJ and with Defendant that the problem with the only IQ test administered here, the results of which are found in Plaintiff's elementary school records, is that it is unclear whether a standardized intelligence test contemplated by the regulations was actually administered, whether it was administered by a qualified individual, whether it was deemed valid by the individual that gave the test, and whether the result is consistent with Plaintiff's developmental history and degree of functional limitation. Interestingly, although no party mentions this, further scrutiny of an enlarged copy of

Plaintiff's elementary school IQ test results contains a reference to a "Lorge Thorndike" test. (Tr. 182.) However, if the IQ test in question was indeed a "Lorge Thorndike" test, there is no evidence on the record as to whether said test is a standardized intelligence test, whether it required conversion to the scale contemplated in the regulations, and, if so, how it would so convert. *See Helton v. Barnhart*, No. 1:04CV00059, 2005 WL 476217, at *3 (W.D.Va. Feb. 7, 2005) (discounting results of "Lorge Thorndike" test because it was unclear "whether [it] should be considered a 'standardized intelligence test' as required by the regulations and th[e] record contains no expert opinion addressing the issue"); *Miller v. Barnhart*, No. 4:05CV00037, 2006 WL 270022, at *2 (W.D.Va. Feb. 3, 2006) ("Plaintiff underwent Lorge-Thorndike IQ testing in 1966 which revealed a Verbal IQ score of 79, a Non-Verbal score of 69 and a Total IQ score of 71. As the Law Judge acknowledged, however, this type of testing is not recognized in the preface to § 12.00 of the Listings.") (citation omitted).

Additionally, there is no narrative at all in the document commenting on whether the IQ score is considered valid and consistent with Plaintiff's developmental history and/or her degree of functional limitation. Consequently, it was impossible for the ALJ, and is impossible for this Court, to determine whether the listed IQ score of 66 is a valid indication of Plaintiff's mental capacity.[13] Nor is there reason to believe that a remand to collect additional

---

[13] As noted, *Hancock* declined to address whether the mere failure to set forth a narrative in an IQ test discussing test validity alone was sufficient grounds to disregard the results of that test. *See Hancock*, 667 F.3d at 475-76. *Hancock* did not address the facts present in this case: the absence of a narrative addressing whether the test results were deemed valid or whether the result was consistent with Plaintiff's developmental history and degree of functional limitation, an inability to determine whether a standardized test was actually administered, **_and_** an inability to determine the identity or credentials of the person who administered it. Additionally, in *Hancock* the claimant underwent intelligence testing ordered by the Administration, whereas here Plaintiff declined to participate in intelligence testing so ordered, thereby preventing the ALJ from securing a valid IQ test. *Id.* at 473.

information regarding the nature of a "Lorge Thorndike" test would remedy these deficiencies because—even assuming the data needed to be and could be converted to a scale contemplated by the regulations—it would still be unclear who administered the test and (because there is no narrative) whether the test was deemed reliable, and/or whether the result was consistent with Plaintiff's developmental history and degree of functional limitation. Ample case law supports an ALJ's decision to decline to rely upon or to invalidate an IQ test under similar circumstances, either because an IQ test could not be converted to the scale approved by the regulations,[14] because an unqualified individual had administered the test,[15]

---

Consequently, the undersigned concludes that this case is materially and factually distinct from *Hancock*.

[14] *See, e.g., Williams ex rel. Williams v. Astrue*, No. 09-00540-N, 2010 WL 3339433, *8 (S.D. Ala. 2010) ("Nor has either the ALJ in his decision, or the Commissioner in answer to this appeal, demonstrated that the OLSAT was individually administered to the plaintiff and is equivalent to the WAIS referenced in the regulations. As stated previously, the regulations provide that 'other standardized and individually administered tests are acceptable, but the numerical values obtained must indicate a similar level of intellectual functioning [to the WAIS].'") (citing 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05.); *Burton v. Barnhart*, No. 06-1051-JTM, 2006 WL 4045937, at *5 (D. Kan. Nov. 1, 2006) ("IQ tests that deviate from a mean of 100 and a standard deviation of 15 must be converted to a percentile rank in order to determine the actual degree of limitation reflected by the IQ scores. The school record in question indicates the test name is SFTAA; thus, the court cannot determine from the record if these IQ test scores reflect a mean of 100 and a standard deviation of 15.") (citation omitted); *Welsh v. Barnhart*, No. 1-01-CV-220, 2002 WL 32073076, at *14-15 (E.D. Tex. Dec. 23, 2002), *rec. adopted*, 2003 WL 1908082 (E.D. Tex. Jan. 22, 2003) ("Plaintiff's brief, however, does not argue or otherwise demonstrate that appropriate conditions were met for using the Shipley test as a reliable, alternative measure of I.Q. in this instance. Dr. Ravichandran's evaluation does not reflect conversion to a percentile rank whereby the Commissioner might determine the actual degree of limitations reflected by plaintiff's extrapolated I.Q. score. The brief cites no case authority—and the court's research fails to disclose any—supporting the assertion that rejection of the Shipley test as a measure of I.Q. is error. Finally, the Shipley test itself does not purport to measure or diagnose mental retardation. Accordingly, plaintiff fails to demonstrate that ALJ Chamberlain erred when she elected to afford little weight to Dr. Ravichandran's assessment that plaintiff's I.Q. score was 64."); *Williams v. Apfel*, No. 97 C 5551, 1998 WL 852872, *5 (N.D. Ill. Dec. 4, 1998) ("Even if we relied on the thirty-year-old scores for the purposes of Listing 12.05(B), Williams presents no evidence that the 1959 and 1962 IQ scores are equivalent to a WAIS IQ score of 59. Section 12.00(D) of the regulations requires the use a standardized intelligence test such as WAIS in assessing the claimant's

because the narrative containing a validation of the test was omitted,[16] or some combination

---

impaired intellectual functioning. Section 12.00(D) further provides that '[i]dentical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning.' The scores enumerated in Listing 12.05 are specified in terms of WAIS and, therefore, if tests other than WAIS are used, the score must be converted to the corresponding percentile rank in the general population to determine the actual degree of impairment reflected by the score. Williams' score has not been converted to WAIS, and therefore, we cannot determine if the score of 59 accurately reflects a similar degree mental functioning under WAIS. Accordingly, we conclude that substantial evidence exists to support the ALJ's finding that Williams does not meet Listing 12.05(B).'") (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(D), 12.05); *cf. Jones v. Apfel*, No. CV-99-6227-ST, 2000 WL 1456907, *13 (D. Or. 2000) ("Accordingly, this case must be remanded to collect evidence as to what an Otis Beta IQ test score means and how a score on that test compares to a score on the WAIS. After making that comparison, the SSA must compare Jones' score and mental limitation with the score provided in the Listing § 12.05C to determine whether Jones meets or equals that Listing. If the SSA determines that Jones' IQ test score equates with a WAIS IQ score of 60–70 as provided in Listing § 12.05C, then the SSA must find that Jones is disabled because ALJ Horton has already determined that Jones suffers from severe physical impairments.").

[15] *See, e.g., Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1207-08 (M.D. Ala. 2002) (concluding that "[t]he plaintiff presented no evidence of the validity of the 1979 test scores and therefore, they cannot be accepted as valid" where—in part—the 1979 IQ exam was administered by psychometrist who was not qualified to perform evaluation); *cf. Ohlinger v. Astrue*, No. 3:09–cv–01078, 2011 WL 289360, *21 (S.D.W. Va. Jan. 26, 2011) ("[T]he ALJ was not required to discuss the qualifications of the sources of Claimant's first three IQ tests, as the sources are unequivocally documented in the record. Claimant's 1983 exam was administered by her school psychologist, Ms. Sullenberger; Ms. Sullenberger clearly indicated in her report the testing which she did not administer personally, which in this case, was the Wide Range Achievement Test (WRAT) administered by Ms. Anderson. Claimant's 1988 exam was administered by Ms. Kelly, a licensed psychologist. Claimant's 1991 exam was administered by Ms. Eddy, a consultant school psychologist. For the purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning, acceptable medical sources are licensed or certified psychologists, including 'school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting.' 20 C.F.R. § 404.1513(a)(2). There is no doubt that the aforementioned individuals were qualified to administer and interpret Claimant's IQ tests.").

[16] *See, e.g., Brooks v. Barnhart*, 167 Fed. App'x 598, 599–600 (9th Cir. 2006) (unpublished) ("Although the record contains a test that shows a Verbal IQ of 59, Performance IQ of 75, and Full–Scale IQ of 65, the record also establishes that the IQ scores are likely invalid because testing was invalid and because the claimant's 'cognitions were not grossly impaired' at the clinical interview. In any event, the scores, alone, are insufficient to establish a severe impairment that meets or equals listing 12.05. The regulations require a narrative report that comment[s] on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation. The relevant doctor's report does not make the required assessment or find 'significantly subaverage' functioning. The record also establishes that the scores are not consistent with the claimant's educational, occupational and functional limitations.") (citations omitted).

of the aforementioned reasons.[17]

In reaching this conclusion, the undersigned acknowledges that an ALJ has a duty to

develop the record, even if the claimant is—as in this case—represented. *Cook v. Heckler*, 783

---

[17] *See, e.g., Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004) (affirming the ALJ's decision to reject the claimant's school IQ scores in part because the school records failed to describe the type of IQ test administered and included no narrative explaining the scores and "not[ing] that it [was] difficult to determine the type of IQ test administered and there is no narrative explaining the scores."); *Thomas v. Astrue*, No. 11–77–GWU, 2012 WL 693533, *4 n.1 (E.D. Ky. March 1, 2012) ("There is a reference in the court's [prior] decision [affirming ALJ's denial of initial claim for benefits] of November 8, 2006 to IQ testing in school records which were performed prior to age 16, not in the current transcript. It was noted that they were performed prior to age 16, when IQ scores stabilize, and were administered by persons with unknown credentials and were an unknown variety of IQ testing. Thus, the undersigned found that they did not support a finding that LOI 12.05C was satisfied."); *Heard v. Astrue*, No. 2:10CV77, 2012 WL 368678, at *10 (E.D.Mo. Feb. 3, 2012) ("While the record does identify the test administered as the WISC–R, the test itself is not included in the administrative record, nor does the record include a narrative explaining the scores. Instead, the scores achieved are simply written on a small graph. The record contains no information, nor does Plaintiff offer any, tending to show that the IQ test was properly administered using accepted techniques, or that it was performed by one qualified to administer such tests or even reviewed by a qualified individual and deemed valid."); *Byrd v. Astrue*, No. 5:11–CV–48, 2011 WL 7121617, *5, 15 (N.D. W.Va. Aug. 1, 2011) (concluding that Plaintiff failed to carry his burden in establishing that he meets Listing 12.05C where the only evidence indicating that the Plaintiff had an IQ between 60 to 70 was a one-time full-scale IQ test administered by a medical assistant whose report consists only of a bare summary that is unaccompanied by any form of narrative report or explanation of the testing and results); *Austin v. Astrue*, No. 4:10cv129–WAP–DAS, 2011 WL 7615065, * (N.D. Miss. July 14, 2011) ("The court has reviewed the school records the claimant submitted to the Appeals Council, and those records actually indicate scores on three separate 'Mental Ability or Intelligence Tests' administered to the claimant during the course of her attendance of elementary school, including the PMA/SRA (IQ–67); Otis–Lennon (IQ–69); and R.A. (IQ–74). The information related to these scores merely includes the name of the test administered, the age of the claimant, and the date. These bare scores do not meet the requirements of acceptable evidence of intelligence testing under the regulations."); *Watts v. Astrue*, Case No. 6:08cv293, 2009 WL 3764044, at *3 (E.D. Ky. Nov. 10, 2009) ("[T]here is no indication of who gave the IQ test, nor is there any narrative report accompanying the score that would modify, verify, or explain the results. For [these and other] reasons, this elementary school IQ test is invalid, and it is unnecessary for the ALJ to consider it when making his determination."); *Henderson v. Astrue*, No. 4:07-CV-093-A, 2008 WL 269450, *6 (N.D. Tex. Jan. 30, 2008) (affirming ALJ's reject of IQ tests administered by an unknown person in part because "[n]o independent report from that individual is in the record, which is an omission that on its own casts doubt on the value of the IQ scores because the regulations require that IQ testing include both the objective data and a narrative report that discusses whether or not the scores are considered valid and consistent with the individual's developmental history and degree of functional restriction").

F.2d 1168, 1173 (4th Cir. 1986). In order to develop the record, an ALJ may request additional evidence, including physical examinations or tests. 20 C.F.R. §§ 404.1517, 416.917. "Moreover, evidentiary gaps that result in unfairness or clear prejudice require a remand." *Fleming v. Barnhart*, 284 F. Supp. 2d 256, 272 (D. Md. 2003) (citing *Brown v. Shalala*, 44 F.3d 931, 935–36 (11th Cir.1995); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)). Here, the Administration made efforts to fill the evidentiary gap with additional IQ testing but was stymied and there is no other valid evidence of IQ testing on the record.

More specifically, the Administration had earlier determined that a consultative mental status evaluation/psychological examination was warranted. (Tr. 367.) An examination with a psychologist was scheduled and a notice and reminder were sent ***both*** to Plaintiff and her attorney. However, Plaintiff did not attend, nor did she call to explain that she would not be attending or to reschedule, nor is there anything in the record or the briefing detailing any efforts by Plaintiff's counsel to explain or remedy Plaintiff's absence. (*Id.* at 366-68.) The State Agency medical team concluded that a denial for failure to attend a consultative examination was warranted as there was insufficient evidence to judge Plaintiff's claim. (*Id.* at 366-67.) The notice of the denial of reconsideration recounts the efforts made to schedule the examination and Plaintiff's failure to appear or otherwise explain. (Tr. 70.) ("The evidence shows that in order to properly assess your claim a[ ] special exam was needed. It was schedule for 11/06/07. Letters were sent to you and your attorney on 10/16/07 advising you of the exam. Reminder letters were sent on 10/30/07. You did not attend the exam, nor was this office contacted to cancel or reschedule. Since you have not cooperated, we are

22

unable to make a decision on your claim and benefits are denied. We told you that if you did not keep the appointment, a decision would be made based on the information in file. The evidence does not show you are disabled.") In light of all of the above, the undersigned concludes that the ALJ's decision to discount the only IQ test on record is supported by substantial evidence and that any gap in the record and prejudice arising from the same is properly attributed to Plaintiff and/or her counsel. Absent a valid IQ score, Plaintiff cannot satisfy the 12.05C analysis.

### C. Because the ALJ's Prong 2 Conclusion Is Supported by Substantial Evidence, Plaintiff Cannot Meet the Criteria of Listing 12.05.

Last, the only remaining Prong to consider is Prong 3. To qualify as a "significant work-related limitation" under Prong 3, the required physical or mental impairment "need not be disabling in and of itself." *Branham v. Heckler*, 775 F.2d 1271, 1273 (4th Cir. 1985). This requirement is therefore met when the ALJ has found that a claimant has other severe impairments. *Luckey*, 890 F.2d at 669; *Watson*, No. CBD–11–2491, 2013 WL 136425, at *8 (D.Md. Jan. 9, 2013); 20 C.F.R. pt. 404, Subpart P, App. 1, § 12.00A (describing "significantly limits" as, "i.e., is a 'severe' impairment(s), as defined in [§ 416.920(c)]). Here, at step two, the ALJ concluded that Plaintiff's diabetes mellitus and arthritis were severe impairments. Thus, if Prongs 1 and 2 are satisfied here, Plaintiff would necessarily satisfy Prong 3 of the 12.05C analysis. However, because the ALJ's Prong 2 conclusion is supported by substantial evidence, Plaintiff cannot meet the criteria of a 12.05 Listing. *Hancock*, 667 F.3d at 475 (concluding that Plaintiff "can prevail only if she establishes that the ALJ erred in his analysis of Prong 1 and Prong 2"). To sum, after carefully evaluating both the briefs of the parties and

the entire record, the undersigned finds that substantial evidence supports a finding that Plaintiff did not carry her burden on the only issue raised in this case. *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) ("Through the fourth step, the burden of production and proof is on the claimant").

## VI. CONCLUSION

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (Docket Entry 11) be **DENIED**, Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be **GRANTED** and the final decision of the Commissioner be upheld.

Joe L. Webster
United States Magistrate Judge

Durham, North Carolina
January 22, 2014